O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| **CENTEX HOMES, a Nevada general partnership,** | Case No.: SACV 13-00998-DOC (ANx) |
| Plaintiff, | |
| vs. | **ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT [46]** |
| **LEXINGTON INSURANCE COMPANY, and DOES 1 through 10, inclusive,** | |
| Defendants. | |

Before the Court is the Motion for Partial Summary Judgment (the "Motion") (Dkt. 46) filed by Defendant, Lexington Insurance Company ("Lexington"). Oral arguments were heard on November 20, 2014. After considering the relevant briefings and oral argument, the Court hereby DENIES the Motion.

## I. BACKGROUND

### A. The Construction Project

This is an insurance coverage dispute. Plaintiff, Centex Homes ("Centex"), is a residential home developer. On August 12, 2004, Centex subcontracted with Gateway Concrete, Inc. ("Gateway") to install concrete foundations for the Coyote Canyon housing development in Fontana, California (the "Project"). Dkt. 46-2, Lexington's Statement of Uncontroverted Facts and Conclusions of Law ("UF") 19. Among other things, the subcontract required Gateway to purchase insurance with an endorsement naming Centex as an additional insured, to the extent available, relative to "'property damage' occurring after all Work has been completed and [to] continue after that portion of 'your work' out of which the injury or damage arises has been put to its intended use." UF 19.

### B. The Insurance Policies

Gateway obtained commercial general liability ("CGL") insurance policies from Lexington. Policy numbers 1070454 and 1070497 (the "Policies") were effective from August 19, 2005 to October 1, 2006, and October 1, 2006, to October 1, 2007, respectively. UF 1. The Policies have a $1 million "each 'occurrence' limit," a $2 million "general aggregate limit," and a $1 million "products-completed operation aggregate limit." UF 2.

Under the Policies, Lexington agreed, with certain exclusions, to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages." UF 3-4. Coverage under the Policies does not include 'bodily injury' or 'property damage' occurring outside the policy period. *Id.*

### C. The Underlying Homeowner Action

The homes Gateway worked on were sold between August 2005 and October 2007. UF 20. On or about February 4, 2009, several individuals who purchased homes within the Project sent Centex a Notice of Claim of Violation of Functionality Standards pursuant to California Civil Code §§ 895–945.5 (known as the Right to Repair law), which initiated SB 800 proceedings for alleged construction defects. UF 21. On or about November 3, 2009, the

homeowners filed a lawsuit against Centex captioned *Burns, et al. v. Centex Homes, et al.*, San Bernardino County Superior Court Case No. S915775 (the "Underlying Action"). UF 23. In the Underlying Action, the homeowners sought recovery for property damage to their homes allegedly resulting from the work of Centex and/or its subcontractors. UF 24. Centex cross-complained against its subcontractors, including Gateway. UF 27.

On September 1, 2011, Centex settled the Underlying Action with the homeowners for $1,078,000. UF 28. After an application for determination of good faith settlement (California Code of Civil Procedure § 877.6), the superior court allocated $160,837 of the settlement to Gateway's work on the Project. *Id.* On March 23, 2012, Centex and Gateway entered into a settlement on the cross-complaint in the Underlying Action. UF 29. Upon the stipulation of the parties, the trial court entered judgment in favor of Centex in the amount of $199,999. UF 30. Centex alleges that $50,000 of the stipulated judgment has been paid, partly by Gateway and partly by another insurer, National Fire & Marin Insurance Company (which is a Cross-Defendant in this action). UF 31.

### D. Lexington's Denial of Coverage

On February 27, 2009, Centex tendered the defense and indemnity of the SB 800 proceeding and the resulting Underlying Action to Lexington as a purported additional insured under the Policies. UF 22. On or about April 12, 2010, Lexington sent a letter to Centex stating several grounds for its decision to decline coverage. UF 32–39. On March 3, 2011, and April 2, 2012, Lexington issued two additional letters to Centex maintaining its position that it had no duty to defend or indemnify Centex in the Underlying Action. UF 40–44.

### E. Procedural History

On June 4, 2013, Centex filed this action in Orange County superior court. UF 45. On July 1, 2013, Lexington removed the action to this Court. UF 47. On October 6, 2014, Lexington filed this motion for partial summary judgment. Dkt. 46. Centex filed its opposition on October 20, 2014. Dkt. 56. On November 4, 2014, Lexington filed its reply brief. Dkt. 71. On November 7, 2014, the Court issued an order requesting additional briefing. Dkt. 65.

## II. LEGAL STANDARD

Summary judgment or partial summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. Whether a fact is material is determined by the substantive law governing the claim or defense. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is required only to consider evidence set forth in the moving and opposing papers and in the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III. ANALYSIS

#### A. Claim for Breach of Contract

"The determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy." *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993); *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993). In order to prevail in an insurance coverage dispute regarding the duty to defend, "the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." *Montrose Chemical Corp.*, 6 Cal. 4th 287, 300 (1993). "Any limitation on the coverage provided by a liability insurance policy must be express and consistent with the reasonable expectations of the insured." *Am. Safety Indem. Co. v. Admiral Ins. Co.*, 220 Cal. App. 4th 1, 4 (2013), *review denied* (Dec. 18, 2013). In order to prevail in a coverage dispute, the insurer must prove that "its interpretation [of the provision] is the only reasonable one." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 655 (2003), *as modified on denial of reh'g* (Sept. 17, 2003) (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995), *as modified on denial of reh'g* (Oct. 26, 1995).

The interpretation of an insurance policy is a question of law, determined, if possible, solely from the terms of the policy and their clear and explicit meaning (understood in their ordinary and popular sense). *Waller*, 11 Cal. 4th at 18. The intent of the parties to an insurance policy is to be determined from the plain meaning of the policy's written provisions, construed within the context of the entire contract and the circumstances of the claim. *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821–22 (1990); Cal. Civ. Code §§1636–1639 and 1641.

"In order to prevail on a motion for summary adjudication of the duty to defend, 'the insured need only show that the underlying claim *may* fall within coverage; the insurer must prove it *cannot*.'" *Atlantic Mutual Ins. Co. v. J. Lamb, Inc.,* 100 Cal. App. 4th 1017, 1032 (2002) (quoting *Montrose*, 6 Cal. 4th at 300) (emphasis in original). "Doubts concerning the

potential for coverage and the existence of a duty to defend are resolved in favor of the insured." *Regional Steel Corp. v. Liberty Surplus*, 226 Cal. App. 4th 1377, 1389 (2014).

Lexington advances several arguments for why Centex's claim for breach of contract fails: (1) Only Gateway could satisfy the Self-Insured Retention requirement and it never did so; (2) Centex is not an additional insured with respect to the claim asserted in the Underlying Action; and (3) policy exclusions bar coverage for the types of damages alleges to have resulted from Gateway's work.

### 1. There Is a Genuine Dispute of Fact as to whether the Self-Insured Retention Was Satisfied

Lexington argues that coverage under the Policies—including the duty to defend—was not triggered because Gateway failed to satisfy the Self-Insured Retention ("SIR") requirement in the Policies. The Policies contain an SIR Endorsement. Dkt. 46-1, Exs. C (C-7–C-10) and D (D-8–D-11). The SIR Endorsement establishes a "Retained Limit" of $25,000 per "occurrence." *Id.* at C-7, D-8. Under the SIR Endorsement, Gateway is obligated to "assume the Retained Limit" and Lexington has no duty to defend under the Policies "unless and until the Retained Limit is exhausted." *Id.*

"Liability insurance policies often contain a 'deductible' or a 'self-insured retention' (SIR) requiring the insured to bear a portion of a loss otherwise covered by the policy." *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1473–74 (2010) (internal quotation marks omitted). "The term 'retention' (or 'retained limit') refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied before there is any coverage under the policy. It is often referred to as a 'self-insured retention' or 'SIR.'" *Id.* at 1474 (internal quotation marks omitted). Although an SIR is, in some ways, similar to a deductible in an insurance policy, "[u]nlike a deductible, which generally relates only to damages, an SIR also applies to defense costs and settlement of any claim." *Id.*[1] However, "the

---

[1] "A 'deductible' is a portion of an insured loss for which the insured is responsible. It generally is 'a specific sum that the insured must pay before the insurer owes its duty to indemnify the insured for a

term 'self-insured retention' or 'retained limit' in an insurance policy can reasonably connote to the insured no more than what is expressly stated in the policy." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 694, 697 (2010) (insurer had duty to defend despite insured's failure to exhaust retained limit where policy "did not state that the duty to defend was limited by the retained limit in any manner").

The following questions about the SIR Endorsement are relevant to the Motion: (1) does the SIR Endorsement apply to Centex; (2) if the SIR Endorsement applies to Centex, could the SIR be satisfied by payments made by Centex; and (3) did Gateway satisfy the SIR.

### a) The Primary/Non-contributory Endorsement does not render the SIR requirement inapplicable to Centex

Centex argues that the SIR Endorsement does not apply to Centex because the Primary/Non-contributory Endorsement provides "primary" coverage. Dkt 56 (sealed) at 9–11. The Primary/Non-contributory Endorsement states: "Notwithstanding any other provision of the policy to the contrary, the insurance afforded by this policy for the benefit of the Additional Insured shall be *primary* insurance, but only with respect to any claim, loss or liability arising out of the named Insured's operations; and any insurance maintained by the Additional Insured shall be *non-contributing*." Dkt. 46-1, Ex. C, at C-5 (emphasis added).

Centex's argument relies on the distinction between primary and excess insurance. "Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability." *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 597 (1981). "'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only

---

covered loss.' A deductible relates only to the 'damages for which the insured is indemnified, *not to defense costs.* The insurer is fully responsible for defense costs regardless of the amount of the deductible so long as there is a potential for coverage under the policy.'" *Forecast Homes*, 181 Cal. App. 4th at 1474 (internal citations omitted).

after a predetermined amount of primary coverage has been exhausted." *Id.* at 598. Some courts have treated SIRs as the equivalent of primary insurance and policies which are subject to SIRs as the equivalent of excess insurance. *See, e.g.*, *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1474 (2010) (discussing the analogy). Relying on this analogy, Centex argues that requiring the SIR to be satisfied before Centex is covered under the Policies would contradict the Primary/Non-contributory Endorsement. Thus, according to Centex, by using the term "primary insurance" in the Primary/Non-contributory Endorsement, the parties intended to modify the Policies such that Lexington's duty to defend and indemnify Centex immediately attached when the homeowners served their notice of claim in the Underlying Action (notwithstanding Gateway's obligation to satisfy the SIR before it had coverage). The Court disagrees.

Although the analogy is useful in illustrating the relative responsibilities of policies that are subject to exhaustion of underlying limits, "as noted by one respected legal treatise, '[t]he analogy between "primary" and "excess" insurance should not be carried too far. An SIR is *not* the same as primary insurance for all purposes.'" *Forecast Homes*, 181 Cal. App. 4th at 1474 (quoting H. Walter Croskey, et al., California Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 7:387). Centex fails to cite, and the Court is not aware of, any case which holds that "primary/non-contributory" language in a policy nullifies an SIR provision. *Cf. Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*, 81 Cal. App. 4th 356, 368 (2000) (rejecting "the proposed principle an SIR *is* a primary policy and should be treated as primary insurance"); *see also Axis Surplus Ins. Co. v. Glencoe Ins. Ltd.*, 204 Cal. App. 4th 1214, 1227 n.2 (2012) (recognizing the analogy between primary and excess insurance but declining to treat policies with SIRs as excess policies in an equitable contribution action against a co-insurer).

Read in context, the purpose of the Primary/Non-contributory Endorsement is clear. *See St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1056 (2002) (Insurance provision "must be construed in the context of the policy as a whole, and in the circumstances of the case."). Under this provision, if Centex (the general contractor)

had other insurance in connection with the Project, for "any claim, loss or liability arising out of [Gateway's] operations," the coverage limits of Gateway's (a subcontractor) policy would be exhausted before Centex's other insurance would be required to pay, and no contribution could be sought from Centex's other insurance for the amount paid by Gateway's policy. In other words, the Primary/Non-contributory Endorsement prioritizes the sequence of payment obligations of different policies. It does not modify the SIR Endorsement.[2] Therefore, satisfaction of the SIR was required before either Gateway or Centex were covered under the Policies.

### b) The Policies do not preclude additional insureds from satisfying the SIR

Lexington argues that only Gateway could satisfy the SIR. In other words, Lexington's position is that Centex had no coverage under the Policies until the SIR was satisfied, but Centex could not make payments to satisfy the SIR. In relevant part, the SIR Endorsement states:

I. LIMITS OF INSURANCE

The LIMTS OF INSURANCE as set forth in Item 3 of the Declarations shall apply excess of a Self-Insured Retention (hereafter referred to as the "Retained Limit") in the amount of [$25,000] and you agree to assume the Retained Limit. The Retained Limit, or any part of it, shall not be insured without our prior written approval.

II. DEFENSE AND SETTLEMENT – COVERAGES A AND B

. . .

---

[2] Centex's reliance on the label of "primary insurance" in the Additional Insured Endorsement conflicts with the principle that "the labels used to define policy terms are not controlling; the terms themselves are." *See Vons Companies, Inc. v. United States Fire Ins. Co.*, 78 Cal. App. 4th 52, 62 (2000), *as modified* (Mar. 6, 2000).

    A. WITHIN THE RETAINED LIMIT

    We do not have the duty to investigate or defend any "occurrence", claim or "suit" unless and until the Retained Limit is exhausted with respect to that "occurrence", claim or "suit". . . .

    B. WITHIN THE RETAINED LIMIT

        1. Once the Retained Limit is exhausted, with respect to any specific "occurrence", claim or "suit", we shall thereafter have the right and duty to defend that "occurrence", claim or "suit".

    . . .

    IV. DEFENSE AND SETTLEMENT – COVERAGES A AND B

    Your bankruptcy, insolvency, inability to pay, failure to pay, or refusal to pay the Retained Limit will not increase our obligation under the policy. In the event there is insurance, whether or not applicable to an "occurrence", claim or "suit" within the Retained Limit, you will continue to be responsible for the full amount of the Retained Limit before the limits of insurance under this policy apply. In no case will we be required to pay the Retained Limit or any portion thereof.

Dkt. 46-1, Exs. C (C-7–C-10) and D (D-8–D-11).

    Unless a policy expressly provides otherwise, a retained limit may be satisfied by a codefendant's payment or by other insurance obtained by the insured. *Forecast Homes*, 181 Cal. App. 4th at 1474–75. "If, under the terms of the policy, the insured would have a reasonable expectation that the insurer would provide a defense, any limitation on the insurer's defense obligation must be conspicuous, plain and clear." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 696 (2010).

    *Forecast Homes*, the case Lexington relies on, is inapposite. In that case, the policies at issue contained one of two different SIR endorsements, called Form-A and Form-B. *Forecast Homes*, 181 Cal. App. 4th at 1470–71. Both forms stated "you [named insured] shall be responsible for payment of all damages and defense costs . . . until you have paid self-insured amounts and defense costs equal to" the per occurrence SIR amount. *Id.* at 1471. It also stated, "Except for any defense costs that we may elect to pay, you shall pay all such defense costs as they are incurred until you have paid defense costs and damages for bodily injury, property

1 damage, personal injury . . . or any other such coverages which may be included in the policy,
2 equal to the applicable self-insured retention amount. If any final judgment or settlement and
3 defense costs is less than the self-insured retention amount stated above, we shall have no
4 obligation to reimburse you or pay defense costs under this policy." *Id.* The forms defined
5 "self-insured retention" as "the amount or amounts which you or any insured must pay for all
6 compensatory damages which you or any insured shall become legally obligated to pay"
7 because of injury or damage covered under the policy. *Id.* Form-B included additional
8 language. It stated, "Payments by others, including but not limited to additional insureds or
9 insurers, do not serve to satisfy the self-insured retention." *Id.* at 1472. Form-B also stated, "[I]t
10 is a condition precedent to our [insurer] liability that you [insured] make actual payment" of
11 SIR. *Id.*

12 Unlike the policies in *Forecast Homes*, the language of the SIR Endorsement ("you
13 agree to assume") does not "conspicuous[ly]," "plain[ly]," or "clear[ly]" limit who may satisfy
14 the SIR requirement. *See Legacy Vulcan*, 185 Cal. App. 4th at 696. At a minimum the SIR
15 Endorsement is ambiguous as to whether payment to satisfy the SIR requirement could only be
16 made by Gateway. And it is reasonable for Centex to expect that Lexington would provide
17 coverage after Centex satisfied the SIR requirement. *See Foster-Gardner, Inc. v. Nat'l Union*
18 *Fire Ins. Co.*, 18 Cal. 4th 857, 869 (1998), *as modified* (Sept. 23, 1998) ("An insurer has a duty
19 to defend when the policy is ambiguous and the insured would reasonably expect the insurer to
20 defend him or her against the suit based on the nature and kind of risk covered by the policy, or
21 when the underlying suit potentially seeks damages within the coverage of the policy.").

22 At the hearing, Lexington's counsel argued that the court in *Forecast Homes* relied only
23 on the word "you" in Form-A in determining *who* was authorized to satisfy the SIR and the
24 remaining language in Form-A was only relevant to *how* the SIR may be satisfied. The Court is
25 not persuaded by this distinction. Rather, *Forecast Homes* analyzed and relied on all the
26 language in Form-A, which more clearly limited who could pay the SIR than the language in
27 the SIR Endorsement in the Policies. It is one thing to say that a person must "assume" an
28 obligation; it is another to say that no one else is authorized to fulfill the obligation. Again, the

Court begins its analysis of the SIR Endorsement with the premise that "a codefendant's payment may satisfy the SIR . . . unless the policy clearly provides otherwise." *Forecast Homes*, 181 Cal. App. 4th at 1475 (internal quotation marks omitted). Notably, the SIR Endorsement expressly prohibits the use of separate insurance to satisfy the SIR (except with prior written approval). *See* Dkt. 46-1, Exs. C (C-7) and D (D-8). If Lexington intended to also preclude an additional insured from satisfying the SIR, it could easily have expressly provided that in the Policies.

Under Lexington's view, Centex had no coverage under the Policies until the SIR was exhausted but it could do nothing to satisfy the SIR. Although an insurance policy could do so, the SIR Endorsement does not expressly provide for this result.

### c) There is a genuine dispute of fact as to whether Gateway satisfied the SIR requirement

Even assuming Centex could not satisfy the SIR requirement, Centex has offered evidence that Gateway paid $25,000. Lexington argues that Gateway's payments did not satisfy the SIR requirement because the payments were made in breach of the Policies. Specifically, Lexington points to the provision in the SIR Endorsement which states: "in no event shall you agree to a settlement in excess of the Retained Limit without our prior written approval." Centex argues that this provision is not enforceable under the facts of the case.

"[I]f an insurer erroneously denies coverage and/or improperly refuses to defend the insured in violation of its contractual duties, the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement." *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958, 984 (2006), *as modified on denial of reh'g* (Feb. 17, 2006) (internal quotation marks omitted). "[W]hen an insurer (1) is duly notified of the underlying claim against its insured; and (2) is given a full opportunity to protect its interests, the resulting judgment—if obtained without fraud or collusion—is binding against the insurer in any later coverage litigation on the claim involving its insured." *Executive Risk Indem., Inc. v. Jones*, 171 Cal. App. 4th 319, 333 (2009).

1  Centex has offered evidence that Lexington was notified of the Underlying Action and
2  was requested to participate in the litigation, including in mediations and settlement
3  conferences, but did not do so. At the hearing on the Motion, Lexington's counsel argued that
4  the settlement between Centex and Gateway was collusive. However, Lexington failed to show
5  undisputed facts establishing collusion. There remains a genuine dispute of fact as to whether
6  Gateway was entitled to enter a settlement with Centex without Lexington's approval.  Thus,
7  summary judgment is not proper.

### 2. The Additional Insured Endorsement Does Not Preclude Coverage

Lexington argues that Centex does not qualify as an additional insured under the Policies because the liability alleged in the Underlying Action arose from Gateway's *completed* operations. Dkt. 46 at 22–28. The Additional Insured Endorsement in the Policies states, in relevant part, that an additional insured is only covered for "liability arising out of [Gateway's] ongoing operations performed for [Lexington]."  Dkt. 46-1, Exs. C (C-11) and D (D-12).

Lexington relies heavily on *Pardee Construction Co. v. Insurance Co. of the West*, 77 Cal. App. 4th 1340, 1350 (2000), *as modified on denial of reh'g* (Feb. 23, 2000). In *Pardee*, contracts between a general contractor and various subcontractors on a construction project required the subcontractors to obtain general liability insurance and to name the general contractor as an additional insured. *Id.* at 1346. The policies were not issued until after the project was completed. *Id.* at 1347. The issue in the case was whether the insurer had a duty to defend the contractor against claims brought by homeowners. Although the court in *Pardee* held that the insurer had a duty to defend, *id.* at 1355–56, Lexington argues that *Pardee* compels summary judgment in its favor because of differences between the policy language in *Pardee* and the policy language here. The additional insured endorsements in *Pardee* did not limit coverage to ongoing operations. Lexington argues that the "ongoing operations" language in the Additional Insured Endorsement precludes the coverage sought by Centex.

The Court disagrees. In *Pardee*, the policies' failure to limit coverage to ongoing operations was determinative because the policies were not issued until *after* the construction project was completed. Under this timing, if coverage had been limited to ongoing operations,

there could have been no coverage. In contrast, the Policies in this case were issued and in effect while Gateway's operations were ongoing. Thus, unlike in *Pardee*, there appears to be a least a possibility that the damage alleged in the Underlying Action occurred during the policy period. Centex has offered evidence to that effect. *See* Dkt. 59 (sealed), Centex's Additional Facts ("CAF") 2–3.

On this point, the standard applicable to determining a duty to defend is relevant. "[I]t is firmly established the duty to defend is broader than the obligation to indemnify." *Pardee*, 77 Cal. App. 4th at 1350. The duty to defend "arises whenever an insurer ascertains facts that give rise to the possibility or the potential of liability to indemnify." *Id.* "A duty to defend does not exist only when the underlying complaint . . . *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*" *Id.* at 1351 (internal quotation marks omitted; alteration and italics in original). Centex has offered a conceivable theory under which some portion of the claims in the Underlying Action would be within the Policy coverage. In arguing otherwise, Lexington incorrectly assumes that all damages claimed in the Underlying Action occurred after Gateway's work was completed. The fact that the homeowners filed the Underlying Action after Gateway's work was completed does not mean that the damages occurred after the work was completed. For example, it is possible that damages alleged by a homeowner in a construction defect case occurred during the "ongoing operations" of a contractor but simply went unnoticed until after the operations were completed.

Thus, the Additional Insured Endorsement does not preclude coverage for Centex.

### 3. Exclusions j(5) and j(6) Do Not Preclude Coverage

While it argues that the Underlying Action cannot have arisen from "ongoing operations," *see supra* Part III.A.2., Lexington also contends that certain exclusions "foreclose[] any possibility for coverage for property damage to real property arising from ongoing operations of [Gateway]." Dkt. 71 (sealed) at 27:9–11. Exclusions j(5) and j(6) of the Policies state:

-14-

1. Exclusions

   This insurance does not apply to:

   . . .

   j. Damage to Property

   "Property damage" to:

   (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

   (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

   . . .

   Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

Dkt. 46-1, Exs. C (C-45–C-46) and D (D-41–D-42).

Lexington relies on *Clarendon America Insurance Co. v. General Security Indemnity Co. of Arizona*, 193 Cal. App. 4th 1311 (2011). In *Clarendon*, a builder entered into construction contract to build a custom home. *Id.* at 1314. The builder obtained a CGL policy from two different insurers for two successive one-year periods, respectively. *Id.* The first insurer defended the builder in a construction defect lawsuit brought by the homeowners. *Id.* at 1315. The first insurer then sought contribution from the second insurer. *Id.* The policy in *Clarendon* included the j(5) and j(6) exclusions. *Id.* at 1325. The court affirmed summary judgment in favor of the second insurer based in part on Exclusions j(5) and j(6) in the CGL policy. *Id.* at 1326.

Lexington argues that the only type of damages that could be claimed by the homeowners in the Underlying Action is necessarily within Exclusions j(5) and j(6). Lexington misreads *Clarendon* and other cases. The court in *Clarendon* stated that under the j(5) and j(6) exclusions, "'[t]he contractor bears the risk of repairing or replacing faulty workmanship, while

1 the insurer bears the risk of damage to the property of others.'" *Id.* (quoting *Blanchard v. State*
2 *Farm Fire & Casualty Co.*, 2 Cal. App. 4th 345, 348 (1991)). In other words, "'[t]he risk of
3 replacing and repairing defective materials or poor workmanship has generally been considered
4 a commercial risk which is not passed on to the liability insurer.'" *Id.* (quoting *Maryland*
5 *Casualty Co. v. Reeder*, 221 Cal. App. 3d 961, 967 (1990)). However, "'liability insurance
6 comes into play when the insured's defective materials or work cause injury to property other
7 than the insured's own work or products." *Id.* (quoting *Reeder*, 221 Cal. App. 3d at 967); *see*
8 *also F & H Const. v. ITT Hartford Ins. Co. of Midwest*, 118 Cal. App. 4th 364, 372–73 (2004)
9 (same). The *Clarendon* court found that Exclusions j(5) and j(6) barred coverage because the
10 homeowner's complaint against the builder "d[id] not reference any damage to the work of
11 others, it simply lists faulty work which must be repaired or replaced" and the first insurer
12 "failed to cite to any specific examples of damage to the work of others that might have been
13 caused by [the builder] allegedly faulty work." *Id.* at 1326. In contrast, the Underlying Action
14 alleges damages both for the costs of replacing and reconstructing faulty work "as well as to
15 correct, replace and reconstruct the *damage to the property resulting therefrom*." Dkt. 47,
16 Lexington's Request for Judicial Notice, Ex. 1 ¶ 14 (emphasis added).[3] Therefore, because the
17 homeowners allege damages to other property, Exclusions j(5) and j(6) do not apply.[4]

---

[3] The Court grants Lexington's request for judicial notice of the complaint in the Underlying Action.

[4] Even assuming Lexington's view of Exclusions j(5) and j(6) is correct (i.e., that they foreclose any possibility for coverage for property damage to real property arising from ongoing operations of Gateway), this interpretation conflicts with the Additional Insured Endorsement which expressly provides Centex coverage as an additional insured for liability arising out of Gateway's ongoing operations. "[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls." *Am. Way Cellular, Inc. v. Travelers Prop. Cas. Co. of Am.*, 216 Cal. App. 4th 1040, 1057 (2013) (quoting *Aerojet–General Corp. v. Transport Indemnity Co.*, 17 Cal. 4th 38, 50, n.4 (1997)).

At the hearing on the Motion, Lexington's counsel acknowledged a logical possibility of a CGL policy with Exclusions j(5) and j(6) potentially providing coverage for a construction defect claim in which the claimant alleges damages both for the cost to replace faulty work *and* for damages to the home caused by the faulty work. Counsel argued, however, that coverage in this case is factually not possible because of the nature of the cement work performed by Gateway. Lexington may or may not be correct in this. However, the Court has not been presented with undisputed facts establishing a factual impossibility for coverage. *See Montrose*, 6 Cal. 4th at 299–300 ("Any doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor.").

Based on the foregoing, Lexington has not established that, based on the undisputed facts, it is entitled to judgment as a matter of law on Centex's breach of contract claim.

### B. Claim for Insurance Bad Faith

"The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. 'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits.'" *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007), *as modified* (Dec. 19, 2007). To establish a breach of the implied covenant, an insured must show: "(1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 (1990). "An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." *Wilson*, 42 Cal. 4th at 723 ("[T]he critical issue [is] the reasonableness of the insurers conduct under the facts of the particular case.").

Lexington asserts two grounds for the Court to grant summary judgment on Centex's claim for breach of the covenant of good faith and fair dealing. First, it argues that the claim fails because there was no potential for coverage under the Policies. *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995), *as modified on denial of reh'g* (Oct. 26, 1995) ("[I]f there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing . . . ."). The

Court rejects this argument because of the Court's finding that there is potential for coverage, *see supra* Part III.A.

Second, Lexington argues that its decision to deny Centex's claim was soundly based on substantial case law supporting its interpretation of the exclusions and other provisions of the Policies. Centex counters by, among other things, pointing out that Lexington took nearly 14 months to make a decision to deny coverage and arguing that the delay was unreasonable. *See* UF 21, 32. In an effort to explain the delay, Lexington responds by offering evidence of correspondence and other activity that occurred during the 14-month period. Viewed in the light most favorable to Centex, a jury could conclude that Lexington acted unreasonably.[5] Therefore, Lexington is not entitled to summary judgment on Centex's claim for breach of the covenant of good faith and fair dealing. *See Wilson*, 42 Cal. 4th at 724, *as modified* (Dec. 19, 2007) ("[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.").

## IV.   DISPOSITION

For the reasons stated above, Lexington's Motion for Partial Summary Judgment is DENIED.

*[signature: David O. Carter]*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE

Dated:  November 24, 2014SA

---

[5] Because of this conclusion, the Court need not address Centex's other arguments against summary judgment on Centex's claim for breach of the covenant of good faith and fair dealing.